## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JONATHAN SANDERS,** | |
| **Plaintiff,** | |
| **v.** | Civ. No. 18- 01057 (KM) (JBC) |
| **JERSEY CITY; JERSEY CITY POLICE DEPARTMENT; OFFICER M. OTUNDO, OFFICER F. A. MONTERO, OFFICER BAUER, OFFICER SALEH, and JOHN DOES 1–10, individually and in their official capacities as Officers with the Jersey City Police Department;** | **OPINION** |
| **Defendants.** | |

### KEVIN MCNULTY, U.S.D.J.:

Jersey City Police Officers Morton Otundo, Francisco Montero, Albert Bauer, and John Saleh responded to calls about a dog chasing people on the street and the dog's drunk owner, Jonathan Sanders. When the officers confronted Mr. Sanders, a physical altercation ensued, concluding with Sanders's arrest. Having suffered serious injuries, Sanders sued the officers, Jersey City, and the Jersey City Police Department, alleging constitutional and tort claims. Officer Otundo (DE 65) and the other Defendants (DE 66) separately move for summary judgment.[1]

---

[1]     Certain citations to the record are abbreviated as follows:

DE = docket entry

Compl. = Complaint (DE 1)

Otundo Br. = Officer Otundo's Brief in Support of his Motion for Summary Judgment (DE 65-14)

Defs. Br. = Remaining Defendants' Brief in Support of their Motion for Summary Judgment (DE 66-1)

I am as always respectful of the mission of the police, who are called upon to make rational judgments with respect to persons who are not always acting rationally—and, unlike a judge, to do so without the benefit of hindsight and leisurely deliberation. Still, the summary judgment standard requires that I withhold judgment when the evidence presents material, disputed issues of fact. Finding such triable issues, I must deny defendants' motions for summary judgment in many respects. For the following reasons, then, the motions (DE 65, 66) are **GRANTED IN PART** and **DENIED IN PART**.

---

Opp. to Otundo Br. = Mr. Sanders's Opposition to Officer Otundo's Motion for Summary Judgment (DE 70)

Opp. to Defs. Br. = Mr. Sanders's Opposition to the remaining Defendants' Motion for Summary Judgment (DE 69)

Azem Videos 1–5 = "Videos from Witness Azem" submitted to the Court as Ex. N to the remaining Defendants' Motion for Summary Judgment (*See* 66-5)

Bauer Dep. = Transcript of Deposition of Officer Bauer (DE 66-7, Ex. I)

Bldg. Video = "Sanders Video" submitted to the Court as Ex. N to Remaining Defendants' Motion for Summary Judgment (*See* 66-5)

Crim. Compl. = Criminal Complaint (DE 65-12)

Gardere Rep. = Report of Dr. Jeffrey R. Gardere (DE 69-25)

IA Rep. = Internal Affairs Report (DE 70-13)

Miller Dep. = Deposition Transcript of Mark Miller (DE 66-8, Ex. M)

Montero Dep. = Transcript of Deposition of Officer Montero (DE 70-10)

Muni. Ct. Doc. = Municipal Court Dismissal of Charges (DE 70-23)

Otundo Dep. = Transcript of Deposition of Officer Otundo (DE 66-7, Ex. K)

Otundo Rep. = Investigation Report of Officer Otundo (DE 65-9)

Saleh Dep. = Transcript of Deposition of Officer Saleh (DE 66-7, Ex. J)

Saleh Rep. = Report of Officer Saleh (DE 65-7)

Sanders Dep. = Transcript of Deposition of Mr. Sanders (DE 66-8, Ex. L)

Shane Rep. = Expert Report of Dr. Jon M. Shane (DE 69-18)

Torchinsky Rep. = Report of Dr. Warren M. Torchinsky (DE 69-21)

## I.   BACKGROUND

There is no genuine dispute regarding how the events unfolded pre- and post-altercation. But there are different versions of what occurred during the altercation. I therefore trifurcate my discussion of the facts.

### A. Pre-Altercation Events

On May 5, 2017, after drinking four or five margaritas with friends, Mr. Sanders returned to his apartment building in Jersey City. (Sanders Dep. at 22:2–3, 24:1–16, 25:5–22.) Soon after, his dog (Magoo, a 65-pound Staffordshire Terrier) escaped from his apartment. (*Id.* at 28:4–8, 31:18–19, 32:15–19, 34:19.) Sanders followed and found Magoo outside the doors to the building. (*Id.* at 39:6–21.) Running from the doors to the street is a long walkway flanked by greenery. (*Id.*) Magoo proceeded to the street, and Sanders followed. (*Id.* at 43:23–42:8.) Magoo then chased or came frighteningly close to some local residents. (DE 65-6.) These residents called 911 to report an uncontrollable dog and intoxicated owner. (*Id.*)

Officers Bauer and Saleh responded. (Bauer Dep. at 41:21–25.) By then, Mr. Sanders had gotten Magoo back near the door. (Sanders Dep. at 47:19–21, 50:4–22.) The officers proceeded up the walkway while yelling to Sanders to leash his dog. (Azem Video 1 at 0:07–42; *see also* Saleh Rep at 1.) Sanders yelled back at them, with a perceivable slur and combative tone, "he's not doing anything," "he's playing," and—repeatedly—"shut the fuck up." (*Id.*; Azem Video 3 at 0:20, 0:38; Azem Video 4 at 0:00–20.) As the officers came further up the walkway, Sanders approached them, saying "If you touch my dog—" while the officers told him to sit down. (Azem Video 5 at 0:27–47.) Then, one officer pushed him to sit down on a retaining wall. (*Id.*)

The officers talked with Mr. Sanders, as Magoo trotted around them. (Bauer Dep. 44:9–12; Saleh Dep. at 62:5–12.) The officers did not observe Magoo to be threatening. (Saleh Dep. at 42:11–15.) Nor did the officers then observe anything suggesting that Sanders would get physical with them. (*Id.* at 43:15–23; Bauer Dep. at 44:13–45:10.)

3

Officers Otundo and Montero soon arrived and joined the conversation. (Otundo Dep. at 74:6–16, 75:2–8; Bldg. Video at 0:00–0:30.) As Mr. Sanders's obstinacy continued, Otundo retrieved from his vehicle a citation book and power cord to use as an improvised leash. (Otundo Dep. at 75:24–76:1, 77:6–10.) Upon returning, Otundo said that he was going to issue a summons for violating the City's leash ordinance. (Otundo Rep. at 2.)

Considering the situation to be "safe," Officers Bauer and Saleh walked back to the street to speak with residents congregating there. (Saleh Dep. at 47:11–20, 51:6–53:20; *see also* Bauer Dep. at 45:11–19.) That left Officers Otundo and Montero with Mr. Sanders and Magoo. (*Id.*)

### B. Altercation

Between video footage and the participants' accounts, no clear, complete picture emerges of what happened next.

#### 1. Video Footage

There is video footage (images, but no sound) from the building's security cameras. (Bldg. Video; IA Rep. at 14–15.) The video shows Mr. Sanders standing and talking with Officers Otundo and Montero. (Bldg. Video at 0:00–0:30.) Otundo attempted to leash Magoo, exciting the dog, who began jumping around the three men. Sanders tried to gain control of Magoo with his right hand, but with his left began pointing in Otundo's direction. (*Id.* at 3:25–4:00). Sanders bent to grab Magoo, while the officers stood calmly. (*Id.* at 4:00–4:40.) While bent over, Sanders raised his left arm a foot or two. Otundo immediately and forcibly pushed Sanders away, and Sanders fell to the ground. (*Id.* at 4:42–48.)

Officer Otundo then attempted to restrain Mr. Sanders. At this point, however, the video picture is partially obstructed by foliage. From what can be seen, Otundo attempted to get Sanders's hands behind his back. There was some struggle between the two, and at one point, it can be seen that Sanders's hand was outstretched towards Otundo's shoulder and neck area. (*Id.* at 4:40–5:35.) Officer Montero walked around them calmly the entire time, snapping

4

his fingers at Magoo. Eventually, Otundo handcuffed Sanders, and Officers Saleh and Baur returned. (*Id.* at 6:20–38.)

### 2. Officer Otundo's Account

Officer Otundo described the event in a report written the same day and later in a deposition.

According to the report, after Officer Otundo attempted to leash Magoo, Mr. Sanders "brought his hand towards [Otundo's] face . . . in a threatening manner," so Otundo "shoved his arm back towards his torso to create distance and due to his highly intoxicated state, [Sanders] lost balance." Otundo then attempted to handcuff Sanders, but "he pulled the arm away and grabbed [Otundo's] neck in a choke hold." Sanders used "his left arm to clutch [Otundo's] uniform shirt over the right shoulder." Both officers gave commands to stop, but Sanders kept his grip. He then let go and "rapidly punched" Otundo in the face. During this altercation, both officers were in "a physical struggle" with Magoo as well. Otundo then "punched [Sanders] three times" in the face; as a result, "he was temporarily stunned"; and the two officers were able to summon Officers Saleh and Baur. (Otundo Rep. at 2.)

According to the deposition, after Officer Otundo attempted to leash Magoo, Mr. Sanders reached for Otundo's gun, prompting Otundo to push him away. (Otundo Dep. at 78:24–79:3.) When Otundo attempted to restrain him on the ground, Sanders tried to "jab[]" him in the face a few times, so Otundo "hit" him in response. Then, Sanders grabbed Otundo's neck, and Otundo responded with punches. (*Id.* at 79:4–12.) Sanders returned several punches. (*Id.* at 84:16–17.) Otundo acknowledged that those punches cannot be seen on video. Otundo also acknowledged that he never told Officer Montero he was being choked or punched. (*Id.* at 153:23–25, 90:18–22, 191:14–23.)

### 3. Mr. Sanders's Account

Mr. Sanders recalled having a conversation with the two officers and suddenly "getting hit in the face." (Sanders Dep. at 63:22–25.) He then remembers being face down, "punched repeatedly," and "called a 'fuckin'

faggot.'" (*Id.* at 67:17–22.) He denies that he was told he was under arrest or that he choked Officer Otundo. (*Id.* at 70:1–23, 74:4–8.) The next thing he remembers is waking up in the hospital. (*Id.* at 71:7–10.)

### 4. Officer Montero's Account

In a report provided a few months after the incident, Officer Montero recounted the incident in terms similar to Officer Otundo's. He stated that Mr. Sanders "brought his hand towards P.O. Otundo's face in a threatening manner," Otundo "shoved his arm back," and, while on the ground, Sanders "grabbed P.O. Otundo by the neck and used his left arm to clutch his uniform." (IA Rep. at 5.) Later, in a deposition for this case, Montero testified that he did not recall the incident. (*E.g.*, Montero Dep. at 55:1–9.)

## C. Post-Altercation Events

### 1. Mr. Sanders's Medical Treatment

Once Officer Otundo subdued and handcuffed Mr. Sanders, he was placed under arrest and brought to a police station for processing by Officers Otundo and Montero. (Otundo Dep. at 123:21–24:23.) It became clear, however, that Sanders had serious facial injuries, so he was taken to a hospital by ambulance, accompanied by the two officers. (*Id.* at 124:3–125:8; Montero Dep. at 60:9–24.) He was handcuffed to a bed for the first 24 hours of what would be a six-day hospital stay involving surgery. (Sanders Dep. at 71:7–10, 77:13–14.)

Mr. Sanders suffered a blowout fracture of his right eye socket as a result Officer Otundo's direct blow to the bone there, as well as a nasal fracture. (Torchinsky Rep. at 3.) A mesh was implanted to prevent his eyeball from falling into the sinus. (*Id.*) Besides physical injury, Sanders now has crippling fears of the police or even walking his dog, requiring psychotherapy. (Gardere Rep. at 8.) He received diagnoses of post-traumatic stress disorder ("PTSD"), major depressive disorder, anxiety disorder, and body dysmorphic disorder due to the trauma of the event and his changed appearance. (*Id.* at 22–23.)

### 2. Criminal Charges

Officers Otundo and Montero left the hospital and went to the police station. (Montero Dep. at 60:9–24.) There, the two prepared an investigation report and a criminal complaint. (Otundo Dep. at 73:14–17, 117:8–12.) Montero swore out the criminal complaint, which charged Mr. Sanders with aggravated assault, resisting arrest, and disorderly conduct. (Crim. Compl. at 3.) Otundo wrote an affidavit of probable cause to support the complaint. (*Id.* at 5.) The charges were eventually dismissed after the officers failed to appear in court. (Muni. Ct. Doc. at 1; Sanders Dep. at 212:13–16.)

### 3. Internal Investigation

Following the incident, Officer Otundo faced disciplinary charges, which the Police Department's Internal Affairs unit ("IA") investigated. (IA Rep.) Otundo had previously faced similar charges, but none had resulted in a finding against him. (*Id.* at 16.) In the incident with Mr. Sanders, the IA found that he had used excessive force; they required reassignment to administrative duties and further protocols should he resume patrol. (*Id.*; Miller Dep. at 58:3–13.)

According to Mr. Sanders, the Department's handling of Officer Otundo's cases is indicative of larger failures. Although the Department has a use-of-force policy and procedures for identifying and monitoring non-compliant officers, the policies and procedures routinely go unenforced. (Shane Rep. at 29–30.) Statistical evidence shows a decline in dispositions of investigations. (*Id.* at 34–35.) Further, investigations drag on for years, and officers are permitted to remain on patrols while they are pending. (*Id.* at 37.) An expert on policing opined that the Department's practices fall below national standards. (*Id.* at 39.) The Department responds that all complaints are investigated, corrective actions are not taken until charges are sustained, and external factors (like concurrent prosecutions or civil litigation) explain the long resolution times. (Miller Dep. at 51:11–25, 55:3–9, 59:23–25, 146:5–48:17.)

**D. Procedural History**

Mr. Sanders sued the four officers, Jersey City, and the Jersey City Police Department. (Compl.) He asserts the following claims:

- Count 1: false arrest and imprisonment, in violation of the Fourth Amendment, pursuant to 42 U.S.C. § 1983, against the officers;

- Count 2: illegal search and seizure, in violation of the Fourth Amendment, pursuant to § 1983, against the officers;

- Count 3: excessive force, in violation of the Fourth Amendment, pursuant to § 1983, against the officers;

- Count 4: municipal liability, pursuant to § 1983 and the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. § 10:6-2, against the City and Department;

- Count 5: violations of corresponding rights under the New Jersey Constitution, pursuant to the NJCRA, against the officers;

- Count 6: failure to intervene, in violation of the Fourth Amendment, pursuant to § 1983, against the officers (except Otundo);

- Count 7: conspiracy, pursuant to § 1983,[2] against the officers;

- Count 8: intentional and negligent infliction of emotional dismiss ("IIED" and "NIED"), against the officers;

- Count 9: malicious prosecution, pursuant to § 1983, against the officers;

- Count 10: assault and battery, against the officers.

(Compl. ¶¶ 33–106.) He seeks compensatory and punitive damages, as well as injunctive relief. (*Id.*, Prayer.) Officer Otundo and the remaining Defendants separately move for summary judgment. This Opinion will focus on three Defendants: Officer Otundo, Officer Montero, and the City.[3]

---

[2]     Mr. Sanders clarifies in his briefs that his claims for conspiracy and malicious prosecution are brought under § 1983. (Opp. to Defs. Br. at 17, 49.)

[3]     Some clutter:

    The Complaint asserts the § 1983 and NJCRA claims against the officers in both their individual and official capacities. (Compl. ¶ 4.) Such claims are permitted only against persons in their individual capacities, not their official capacities. *Downey*

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the

---

*v. Pa. Dep't of Corrs.*, 968 F.3d 299, 309–10 (3d Cir. 2020) (§ 1983); *Estate of Lagano v. Bergen Cnty. Prosecutor's Off.*, 769 F.3d 850, 856 (3d Cir. 2014) (NJCRA). I will therefore dismiss the § 1983 and NJCRA claims for damages as against the officers in their official capacities only, leaving the individual-capacity claims.

The Jersey City Police Department is not properly named as a defendant. A New Jersey police department is a subdivision of municipal government, not a separate legal entity with the capacity to sue or be sued. N.J. Stat. Ann. § 40A:14-118 (municipal police department is "an executive and enforcement function of municipal government"); *see Mitchell v. City of Jersey City*, Civ. No. 15-6907, 2016 WL 1381379, at *1 (D.N.J. Apr. 7, 2016); *McGovern v. Jersey City*, Civ. No. 98-5186 2006 WL 42236, at *7 n.4 (D.N.J. Jan. 6, 2006) (police departments cannot be sued in conjunction with municipalities because police departments are administrative arms of local municipalities, not separate entities); *see also Bonenberger v. Plymouth Township*, 132 F.3d 20, 25 n.4 (3d Cir. 1997); *Padilla v. Twp. of Cherry Hill*, 110 F. App'x 272, 278 (3d Cir. 2004); *cf. Los Angeles County v. Humphries*, 562 U.S. 29, 37 (2010) (*Monell* requirements apply equally to damages and injunctive claims). For claims involving the Department, the proper defendant is the City itself, which is separately named in this complaint. I will therefore dismiss the Department as a redundant defendant, while retaining the City. The correction is technical; the substance of the action is not affected.

Finally, Mr. Sanders concedes that discovery has shown that Officers Baur and Saleh were insufficiently involved in the incident. (Opp. to Defs. Br. at 4 n.1.) They were speaking to residents on the street while the altercation occurred on the walkway, and the two did not arrest Sanders or prepare the charging documents. Accordingly, I will grant summary judgment in favor of Baur and Saleh on all counts.

district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "A fact is material if—taken as true—it would affect the outcome of the case under governing law. And a factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *M.S. by and through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) (quotation marks and citation omitted).

## III.   DISCUSSION

I first assess the constitutional claims asserted via § 1983 and the NJCRA against Officers Otundo and Montero (Section III.A), then the state-law tort claims against those officers (Section III.B), and finally the municipal-liability claim against the City (Section III.C). In sum, I hold that genuine issues of fact preclude summary judgment on the excessive-force claim against Otundo and the failure-to-intervene claim against Montero. Similar factual issues preclude summary judgment on the parallel state-law tort claims.

I am compelled by Supreme Court precedent to find that Officers Otundo and Montero had probable cause to arrest and detain Mr. Sanders based on his violation of the leash ordinance. Nonetheless, they are not entitled to summary judgment on the malicious prosecution claim, because the leash ordinance was never the basis for any formal charge, and there are triable issues as to probable cause for the offenses that were charged.

## A. Constitutional Claims against the Officers

Section 1983 and the NJCRA provide a cause of action to recover for deprivations of constitutional rights. *Walker v. City of Newark*, Civ. No. 19-16853, 2020 WL 3542502, at *6, 13 (D.N.J. June 30, 2020).[4] Nonetheless, qualified immunity, which Defendants invoke here, shields officials from liability unless they violated clearly established rights. *Williams v. City of York*, 967 F.3d 252, 258 (3d Cir. 2020) (§ 1983); *Morillo v. Torres*, 117 A.3d 1206, 1213 (N.J. 2015) (NJCRA). A qualified-immunity defense fails if (1) "the officer violated a constitutional right," and (2) "the right was clearly established." *El v. City of Pittsburgh*, 975 F.3d 327, 334 (3d Cir. 2020); *see Williams*, 967 F.3d at 257 (each defendant must have violated a clearly established right to be held liable).

I take up the remaining claims against Officers Otundo and Montero in rough chronological order. Each officer asserts qualified immunity. Therefore, in each instance, I consider first whether there was a constitutional violation, and second whether any such violation was clearly established.

### 1. Excessive Force

Mr. Sanders alleges that Officers Otundo and Montero used excessive force when arresting him. (Compl., Counts 3, 5.) I first consider whether the record demonstrates that a constitutional violation occurred.

#### a. Constitutional Violation

The Fourth Amendment to the U.S. Constitution and Article I, paragraph 7 of the New Jersey Constitution both protect against "unreasonable searches and seizures." U.S. Const. amend. IV; N.J. Const. Art. 1, ¶ 7. That protection prohibits police officers from using excessive force. *El*, 975 F.3d at 336 (Fourth Amendment); *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 436 (D.N.J.

---

[4]     Mr. Sanders's NJCRA claim (Count 5) essentially alleges that all the federal constitutional violations also amount to violations of the New Jersey Constitution. (*See* Compl. ¶¶ 75–84.) NJCRA and § 1983 claims are construed in parallel. *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011).

2011) (New Jersey Constitution). To prevail on an excessive-force claim, "a plaintiff must show [1] that a seizure occurred and [2] that it was unreasonable under the circumstances." *Id.* (citation omitted). On the first prong, "[a] seizure requires the use of force with intent to restrain." *Torres v. Madrid*, 141 S. Ct. 989, 998 (2021) (emphasis omitted). On the second prong, the question is whether "the officers' actions are objectively reasonable in light of the facts and circumstances." *Williams*, 967 F.3d at 259 (quotation marks and citation omitted). I consider whether a reasonable officer would perceive Mr. Sanders to pose an immediate threat, commit a serious crime, actively resist arrest, or possess a weapon. *El*, 975 F.3d at 336. I also consider whether the force employed was necessary to effect an arrest and otherwise proportional. *Id.*

### i. Officer Otundo

On the first prong, there can be no dispute that Officer Otundo effected a seizure—he shoved Mr. Sanders to the ground and then physically subdued him to make an arrest. On the second prong, genuine issues of material fact exist as to whether the force used was reasonable. I identify them here.

**First,** there is a factual dispute over how a reasonable officer would perceive Mr. Sanders's arm movement and the need to respond physically.

In his deposition, Officer Otundo stated that he perceived that Mr. Sanders was reaching for Otundo's gun. (Otundo Dep. at 78:24–79:3.) Otundo claimed in his contemporaneous report that he viewed the movement as "threatening," although he then made no specific mention of his gun. (Otundo Rep. 2.) This testimony, if credited, could dispose a jury in Otundo's favor.

On the other hand, a juror could think, from the video, that Mr. Sanders seemed only to be finding his balance, and that the movement of his arm was involuntary or minor. Or a juror could credit Sanders's testimony that his acts were aimed at handling Magoo. (Sanders Dep. at 63:22–25.) Further, Officer Montero remained calm and physically uninvolved through all this activity, undermining any assessment of the situation as threatening and tense. Up until that point, Sanders had been rowdy and unruly, but not physical; indeed, Officers Bauer and Saleh had walked away, believing that the situation was

safe. (Saleh Dep. at 47:11–20, 51:6–53:20.) On this version of the events, a juror could find that it was unreasonable for Otundo to perceive Sanders as threatening or reaching for his gun.

The character of Mr. Sanders's arm movement is material because key factors for finding force reasonable are whether the suspect "pose[d] an immediate threat to the safety of the officers" and was "violent or dangerous." *El*, 975 F.3d at 336; *see also Johnson v. City of Philadelphia*, 837 F.3d 343, 350 (3d Cir. 2016) (clear attempt to grab officer's gun will support use of force). Those factors are especially important here because, at this point, other factors did not strongly point to the use of force: Sanders was alone, outnumbered, suspected of only minor non-violent crimes, unarmed, apparently alcohol-impaired, and not under arrest. *See El*, 975 F.3d at 336. The threat which Sanders posed, then, turns on disputed perceptions of the situation, and is therefore a matter for trial. *See Rivas v. City of Passaic*, 365 F.3d 181, 199 (3d Cir. 2004) (cleaned up) ("[A] police officer . . . is not precluded from arguing that he reasonably perceived the facts to be different from those alleged by the plaintiff, but *that* contention must be considered at trial.").

**Second,** there is a factual dispute over how Officer Otundo responded to Mr. Sanders's arm movement, and whether that response was proportional. Otundo stated that he only pushed Sanders in an attempt to create distance. (Otundo Rep. at 2.) Sanders's fall, according to Otundo, was attributable to his intoxicated state. (*Id.*) Alternatively, a juror could view the video and perceive Otundo's physical contact as a forcible shove, intended to level Sanders so he could be restrained. Otundo's account is a matter of credibility for the jury.

This dispute is material because, while the excessive-force standard allows for "split-second judgments," the bottom-line inquiry is whether "the amount of force" was "necessary in a particular situation." *Williams*, 967 F.3d at 259. If a juror takes the view that Officer Otundo intended to forcibly push Mr. Sanders to the ground, then the juror could view the amount of force as unnecessary for an individual who posed no threat. Given a low-stakes

situation involving an unarmed man accused of only a leash-law infraction, a juror could see Otundo's assertion of complete, immediate, forcible control over Sanders as an unreasonable response. Or not; but that is the nature of a factual issue.

**Third,** there is a factual dispute over whether, during the on-the-ground scuffle, Mr. Sanders actively resisted arrest and punched or choked Officer Otundo. Those acts are proffered as the justification for Otundo's punching Sanders in the face three times. In his report, Otundo stated that he did so because Sanders was choking him with one hand and grasping his shoulder with the other. The report also stated that Otundo punched Sanders *after* Sanders first punched Otundo. (Otundo Rep. at 2.) Otundo's deposition contains a more elaborate account. There, Otundo stated that Sanders tried to "jab" fingers in Otundo's face a few times, *then* Otundo "hit" Sanders, *then* Sanders grabbed Otundo's neck, and *then* Otundo responded with punches. (*See* Otundo Dep. at 79:4–12.)

But the video, as Officer Otundo acknowledged, does not show any punches or chokehold by Mr. Sanders. (*Id.* at 84:16–17.) The video does not provide a clear and complete view, however, and therefore is not conclusive. It does not document the level of physicality and aggression from Sanders to which Otundo attested, but perhaps does not rule it out, either. Sanders can be seen rolling around and possibly trying to get his arms free. Otundo's neck is visible for almost all of the time, and no hand can be seen on it, although, the video does show Sanders grabbing Otundo's shoulder. Corroborating the more benign view, Officer Montero was within a few feet of the altercation but apparently did not feel the need to get physically involved, and Otundo never told Montero he was being choked or punched. (Otundo Dep. at 153:23–25, 90:18–22, 191:14–23.)

Mr. Sanders denied the allegations that the officers told him he was being arrested, and denied that he grabbed Officer Otundo's throat. (Sanders Dep. at 70:1–23, 74:4–8.) He also recalls being called a "fuckin' faggot"

repeatedly. (*Id.* at 67:17–22.) A juror, if it credited that testimony, could conclude that repeated use of a slur while punching an arrestee perhaps bespeaks a malign motive beyond that of self-defense or reasonable force.

All said, the reason that Officer Otundo threw punches remains unclear. That factual issue is material because the punches constituted a quite substantial use of force, evidenced by the serious injury that resulted. Now, if Mr. Sanders was in fact trying to choke Otundo, that threat to safety could justify punching Sanders to break the chokehold. But if Sanders did not choke or punch him, Otundo only needed to subdue Sanders. Punches resulting in broken bones and serious facial injury would be unnecessary and excessive, especially if, as a juror could find, Sanders was not forcibly resisting arrest.

Given these material factual disputes, I cannot grant Officer Otundo qualified immunity on the ground that no constitutional violation was shown.

### ii.    Officer Montero

I next consider the first prong of qualified immunity—whether a constitutional violation was shown—as to Officer Montero. Here, summary judgment is a closer call. The video shows that, during the altercation, Montero seemed to be occupied with distracting Magoo. Nonetheless, his feet cannot be seen the whole time. Mr. Sanders contends that Montero kicked him while he and Officer Otundo were on the ground. He points to (1) a use-of-force report filed by Montero in which he checked boxes indicating that he used a compliance hold, his hands/fists, and kicks (DE 69-20); and (2) testimony in which Montero refused to answer questions about his use of force. (Opp. at Defs. Br. at 26–27.)

Mr. Sanders's testimony, credited as it must be on this motion, is sufficient to raise a genuine dispute over whether Officer Montero kicked him. It could perhaps be set aside as a sham if "blatantly contradicted" by the video evidence, but the video, as noted is inconclusive. *Cf. Scott v. Harris,* 550 U.S. 372, 380 (2007) (courts need not accept a version of the facts "blatantly contradicted" by a video). This dispute is material because the gratuitous use of

force when a person is already subdued is unreasonable. *E.g.*, *Noble v. City of Camden*, 112 F. Supp. 3d 208, 227 (D.N.J. 2015).

Given that material factual dispute, I cannot grant Officer Montero qualified immunity on the ground that no constitutional violation was shown.

### b. Clearly Established

The officers may still enjoy qualified immunity on the second, "clearly-established" prong. "To determine whether a right was clearly established, we conduct a two-part inquiry. First, we must define the right allegedly violated at the appropriate level of specificity." *See Peroza-Benitez v. Smith*, --- F.3d ---, ---, No. 20-1390, 2021 WL 1307883, at *4 (3d Cir. Apr. 8, 2021) (quotation marks and citation omitted). In defining the right at this stage, I construe the facts and resolve disputes in Mr. Sanders's favor. *Noble*, 112 F. Supp. 3d at 227; *see Peroza-Benitez*, 2021 WL 1307883, at *7–8; *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam). If, for example, even with facts resolved against the officers, they still did not violate a clearly established right, then they would be entitled to qualified immunity. *See id.* The right here, construing the disputed facts in favor of Sanders, would be the right for a non-threatening individual to be free from being shoved to the ground and repeatedly punched or kicked by an officer while not resisting arrest.

The next step is to compare that right to case law existing at the time of the incident (May 2017) and determine whether that law made it "sufficiently clear" to "a reasonable official . . . that what he is doing violates that right." *Peroza-Benitez*, 2021 WL 1307883, at *4 (citation omitted). To make the issue sufficiently clear, the prior case law must be sufficiently specific. *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). Case law precisely on point, of course, is the quintessential example. But "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *accord Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) (per curiam) (no qualified

16

immunity for corrections officers who forced an inmate to sleep in a sewage covered cell because, while there were no sewage cases, "no reasonable correctional officer could have concluded that ... it was constitutionally permissible to house [an inmate] in such deplorably unsanitary conditions"); *Williams v. Bitner*, 455 F.3d 186, 191 (3d Cir. 2006). I look first to Supreme Court and Third Circuit precedent, then to any "robust consensus" from the Courts of Appeals, and then to "district court cases." *Peroza-Benitez*, 2021 WL 1307883, at *5 (citations omitted).

There is no Third Circuit case factually on point. Perhaps the closest analogue is *Couden v. Duffy*, 446 F.3d 483 (3d Cir. 2006). There, officers, to effect an arrest, threw a 14-year-old to the ground, repeatedly pushed his head down, pointed guns at him, and sprayed him with mace. *Id.* at 490. The Third Circuit held that this force was clearly unreasonable because the victim was unarmed, did not resist, and posed no particular threat. *Id.* at 497.

*Couden* tends to suggest that the conduct here was unreasonable because, in both cases, an officer used substantial force to subdue a person who presented a minimal threat. Indeed, courts had agreed, prior to the events here, that *Couden* stands for the general proposition that "[t]he gratuitous use of force against an arrestee who has already been restrained violates the Fourth Amendment." *Noble*, 112 F. Supp. 3d at 228; *see Anthony v. Seltzer*, 696 F. App'x 79, 82 (3d Cir. 2017) ("[U]nder long-established Fourth Amendment law, force may not legitimately be used against an individual who is compliant and poses no ongoing threat to himself or others, or who is not resisting arrest, even if he was initially non-compliant."). The rule of *Couden*, extended to the facts of this case, would dictate that shoving a person to the ground and punching him three times in the face, or kicking him when he did not present a threat or actively resist, is unconstitutionally excessive and disproportionate.

The facts of *Couden*, as I say, are not precisely on point. There is substantial case law from other Courts of Appeals, however, standing for the

17

same legal rule and applying it to more closely analogous facts. *See, e.g., Kidis v. Reid*, 976 F.3d 708, 720 (6th Cir. 2020) (officer, in 2013, violated clearly established rights when he punched intoxicated individual while he was on the ground and officer was on top of him effecting arrest); *Darden v. City of Fort Worth*, 880 F.3d 722, 732–33 (5th Cir. 2018) (officer, in 2013, violated clearly established rights when he pushed individual down and repeatedly punched and kicked him in the head when he was not actively resisting); *Burnikel v. Fong*, 886 F.3d 706, 711–12 (8th Cir. 2018) (officers, in 2013, violated clearly established rights when they repeatedly punched non-threatening individual, who was on the ground and whose only resistance was attempting to cover his face); *Trammel v. Fruge*, 868 F.3d 332, 343 (5th Cir. 2017) (officers, in 2013, violated clearly established rights when they tackled a non-violent, intoxicated individual to the ground after he pulled his arm away from an officer); *O'Hara v. City of New York*, 570 F. App'x 21, 23–24 (2d Cir. 2014) (officers repeatedly punched an "unarmed, non-menacing" individual in effecting an arrest); *Schreiber v. Moe*, 596 F.3d 323, 332–33 (6th Cir. 2010) (officers pushed unarmed, unthreatening individual to the ground and repeatedly punched him); *Sallenger v. Oakes*, 473 F.3d 731, 740 (7th Cir. 2007) (officers repeatedly punched a mentally ill individual to subdue him, who nonetheless had charged officers and resisted arrest and verbal commands to comply).

Likewise, cases in this District agree that similar gratuitous application of force when effecting an arrest is unreasonable. *See Noble*, 112 F. Supp. 3d at 228 (collecting five cases from this District); *Helms v. Ryder*, Civ. No. 14-2470, 2017 WL 1356323, at *6–7 (D.N.J. Apr. 12, 2017) (four punches while plaintiff was on the ground).

Given the broad consensus of cases in the Courts of Appeals and this District, I find that the right allegedly violated here was sufficiently established at the time of the events. Thus, Officers Otundo and Montero are not entitled to qualified immunity at this stage.

18

Indeed, the parties' disagreement is not really about the law at all. The officers are not claiming they could constitutionally beat a suspect for no reason; rather, they deny that this is what occurred. Unresolved factual issues, which must be tried, stand in the way of application of the qualified immunity doctrine. The motions of Officers Otundo and Montero for summary judgment on Count 3 and Count 5, to the extent based on excessive force, will therefore be denied.

### 2. Failure to Intervene

Mr. Sanders alleges that Officer Montero failed to intervene and stop Officer Otundo's excessive use of force, a distinct constitutional violation. (*See* Compl., Counts 5, 6.)

### a. Constitutional Violation

"A police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force, but only if there is a realistic and reasonable opportunity to intervene." *El*, 975 F.3d at 335 (cleaned up).[5] Of course, a failure-to-intervene claim requires a predicate use of excessive force. *Nifas v. Coleman*, 528 F. App'x 132, 135–36 (3d Cir. 2013). So the factual disputes regarding the excessive-force claim should also preclude summary judgment on the dependent, failure-to-intervene claim.

Nonetheless, I consider whether, even accepting the excessive-force facts in the light most favorable to Mr. Sanders, no reasonable juror could conclude that Officer Montero culpably failed to intervene.

---

[5]     The New Jersey Supreme Court has not addressed whether the New Jersey Constitution also imposes a duty to intervene to prevent excessive force. But that court has held that the Fourth Amendment provides a "floor of constitutional protection"; the implication is that protections of the New Jersey Constitution may not fall short of Fourth Amendment protections but may exceed them. *State v. Hempele*, 576 A.2d 793, 800 (N.J. 1990). So I conclude that any failure to intervene by Officer Montero would violate the New Jersey Constitution, too, and permit an NJCRA claim based thereon. *See Trafton*, 799 F. Supp. 3d at 443–44 (§ 1983 and NJCRA claims arising from excessive force are treated the same).

To the extent Officer Otundo's initial shove was excessive, there can be no failure-to-intervene claim against Officer Montero. That shove happened spontaneously and without warning, and there is no reasonable inference that Officer Montero had the opportunity to prevent it. *See El*, 975 F.3d at 335.

I therefore confine the failure-to-intervene analysis to the subsequent period when Officer Otundo allegedly used excessive force while on the ground with Mr. Sanders. At that point, at least, the timeline does not rule out the possibility that Montero had an opportunity to intervene, so the claim may implicate disputes of fact. *See Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (the reasonable-opportunity-to-intervene standard presents questions of fact for a jury to decide). As to that period, some factual issues arise.

**First,** there is a factual dispute over what Officer Montero could perceive about the altercation as it unfolded. That dispute is material because failure-to-intervene liability requires that Montero saw or was aware of the use of excessive force. *See Smith v. Mensinger*, 293 F.3d 641, 650–51 (3d Cir. 2002) (citations omitted). Montero reported that he witnessed Mr. Sanders "grab[] P.O. Otundo by the neck." (IA Rep. at 5.) If that statement is credited, then a juror could find that Montero only perceived Otundo to be acting in self-defense or lawfully effecting an arrest; on that version of events, no duty to intervene arose. On the other hand, a juror could conclude, based on, e.g., the video, that Sanders did not punch or choke Otundo, and offered minimal resistance. Indeed, Otundo admitted he never gave any indication to Montero during or after the event that he had been punched or choked. (Otundo Dep. at 153:23–25, 90:18–22, 191:14–23.) Throughout the events, the video demonstrates, Montero walked around calmly within a few feet of the two men. A juror could conclude that if an officer perceived a dangerous struggle, he would have done something to reinforce his fellow officer. The same behavior, then, would be consistent with a conclusion that (a) Montero, for whatever reason, did not perceive that Otundo was under attack, or (b) Montero was indifferent to Otundo's application of unreasonable force.

20

**Second,** there is a factual dispute over whether Officer Montero was otherwise occupied during the altercation. *Anderson*, 17 F.3d at 558. On one hand, Officer Otundo's investigation report and the affidavit of probable cause attest that Officer Montero was in a "physical struggle" to keep Magoo away from Otundo and Mr. Sanders. (Otundo Rep. at 2; Crim. Compl. at 4.) On the other hand, the character of Magoo's behavior during the altercation, as seen on video, is a factual matter to be considered by the jury. At one point, Montero appears to be pacing back and forth while snapping or moving his fingers, as Magoo playfully jumped at them. That interpretation would tend to rebut the notion that both officers had their hands full with dual threats.

**Third,** there is a factual issue as to when and how Officer Otundo punched Mr. Sanders. That dispute is material because if the events unfolded in rapid succession, then Officer Montero might not have had a realistic opportunity to intervene. *See O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir. 1988) (three rapid blows did not provide an opportunity to intervene). The video does not clearly show when the punches occurred. In fact, Otundo himself seems to have been somewhat inconsistent about when he punched Mr. Sanders. (*See* Section III.A.1.a.i, *supra.*) Accordingly, there are factual disputes precluding a finding of no constitutional violation on the failure-to-intervene claim.

### b. Clearly Established

On the second prong of qualified immunity, a police officer's duty to intervene to prevent excessive force was well-established by 2017. *Smith*, 293 F.3d at 650–51; *Baker v. Monroe Township*, 50 F.3d 1186, 1193 (3d Cir. 1995). The Third Circuit has held that the right described in *Smith* and *Baker* is sufficiently specific and clear to preclude qualified immunity. *Garbacik v. Janson*, 111 F. App'x 91, 94 (3d Cir. 2004); *see Weimer v. County of Fayette*, 972 F.3d 177, 191 (3d Cir. 2020). If it is sufficiently clear that the partner's force was excessive, then the duty to intervene is likewise clear. *See Rivera v. Como*, 733 F. App'x 587, 590–91 (3d Cir. 2018).

Thus, factual issues bar the application of qualified immunity to Officer Montero on the failure-to-intervene claim. For these reasons, Officer Montero's motion for summary judgment on Count 6 and Count 5, to the extent based on a failure to intervene, will be denied.

### 3. False Arrest and Imprisonment

Once Officers Otundo and Montero gained control of Mr. Sanders, they formally placed him under arrest and detained him. Sanders alleges that, in doing so, they violated his constitutional rights to be free from false arrest and imprisonment. (Compl., Counts 1, 5.)  False-arrest and false-imprisonment claims require Sanders to show that there was (1) an arrest and detention, (2) without probable cause. *Harvard v. Cesnalis*, 973 F.3d 190, 199, 202 (3d Cir. 2020); *accord State v. Gibson*, 95 A.3d 110, 118 (N.J. 2014) (New Jersey Constitution). There can be no dispute that there was a seizure, *i.e.*, an arrest and follow-on detention.[6] The issue, then, is probable cause.

"An officer has probable cause to arrest a person when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Harvard*, 973 F.3d at 199–200 (quotation marks and citation omitted). "This totality-of-the-circumstances inquiry is necessarily fact-intensive," so "summary judgment for false arrest

---

[6]     There was a detention here because Mr. Sanders was put into a police vehicle, taken to a booking station, then taken to a hospital, and handcuffed to the hospital bed. *Nicholson v. City of Los Angeles*, 935 F.3d 685, 691 (9th Cir. 2019) (handcuffed while at hospital); *Gaines v. Pro. Sec. Consultants*, No. CV 16-5130, 2017 WL 10562573, at *3 (C.D. Cal. Nov. 28, 2017) (same); *see Torres*, 141 S. Ct. at 1001 (seizure for Fourth Amendment purposes can occur when there is any "termination of freedom of movement").

Relatedly, although Officer Otundo was primarily involved in subduing and handcuffing Mr. Sanders, Officer Montero still had sufficient personal involvement for a false-arrest and false-imprisonment claim because he (1) helped take Sanders to the vehicle immediately after the handcuffing, (2) took Sanders, with Otundo, to the police station for booking, and (3) took Sanders from there to the hospital. (IA Rep. at 3, 5; Otundo Dep. at 162:12–13.)

and false imprisonment is proper only if no reasonable juror could find a lack of probable cause for any of the charged crimes." *Id.* (quotation marks and citation omitted). I consider (a) the offenses formally charged, (b) the offenses suggested by the charging documents, and (c) the leash ordinance.

### a. Charged Offenses

Mr. Sanders was charged with three offenses: (1) "aggravated assault on law enforcement by punching with his right hand and grabbing Officer Otundo[] . . . by the neck and squeezing it," in violation of N.J. Stat. Ann. § 2C:12-1(a)(1); (2) "resisting arrest by not complying with . . . verbal commands, grabbing and pulling [Officer Otundo] by his uniform shirt," in violation of § 2C:29-2(a)(1); and (3) "disorderly conduct by engagin[g] in a physical confrontation with the arresting officer . . . and using offensive language towards the public," in violation of § 2C:33-2(a)(1). (Crim. Compl. at 3 (capitalization altered).)[7]

For false-arrest-type claims, I only consider whether the officers had probable cause for these offenses *before* the officers began to attempt the arrest. *Groman v. Township of Manalapan*, 47 F.3d 628, 635 (3d Cir. 1995); *see also Trafton*, 799 F. Supp. 2d at 436. The arrest here began when Officer Otundo moved on top of Mr. Sanders after the fall and attempted to restrain him, as this was "application of physical force to the body of a person with intent to restrain [which] is a seizure even if the person does not submit and is not subdued." *See Torres*, 141 S. Ct. at 1003. Anything after Sanders's fall is an artifact, not a cause, of the seizure.[8]

---

[7]    Defendants have submitted three versions of the criminal complaint. At DE 65-12, there are two copies, one with handwriting amending the statutes cited and a signature dated ten days later, possibly by a magistrate. At DE 66-6 (Ex. H), there is a defendant's copy. The copies without handwriting seem to include an additional charge for obstruction of lawful government function. However, the document from the municipal court dismissing the charges reflects the charges listed in the copy with handwriting. I discuss the additional obstruction charge in the following section.

[8]    I consider whether Mr. Sanders's conduct following the initiation of the arrest (*i.e.*, his actions during the altercation) provided probable cause for any offense in

Turning to the charged offenses, there are genuine issues of material fact as to whether Officers Otundo and Montero possessed probable cause. First, the assault offense provides that "[a] person is guilty of assault if the person . . . [a]ttempts to cause or purposely, knowingly or recklessly causes bodily injury to another." N.J. Stat. Ann. § 2C:12-1(a)(1). Assault is "aggravated" if against a police officer. *Id.* § 2C:12-1(b)(5)(a). The only possible assault prior to the arrest was Mr. Sanders's raised hand, to the extent it may be regarded as threatening. There is a factual dispute as to probable cause for assault because a juror could watch the video and think that a reasonable person could only perceive Sanders's hand movements as a product of his intoxication and agitation. (*See* Section III.A.1.a.i, *supra.*) A juror could thus find it unreasonable for Otundo to perceive such a slight movement from an otherwise non-threatening individual as a threat to strike the officer.

Second, "the resisting arrest charge could not have provided probable cause for the arrest." *Groman*, 47 F.3d at 635; *see also Trafton*, 799 F. Supp. 2d at 436. Courts have viewed such retroactive justifications with a jaundiced eye, and rightly so. *Id.*

Third, the disorderly-conduct offense provides that "[a] person is guilty . . . if with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof he . . . [e]ngages in fighting or threatening, or in violent or tumultuous behavior." N.J. Stat. Ann. § 2C:33-2(a)(1). A juror could readily conclude that, prior to the arrest, Mr. Sanders had not engaged in any fighting or threatening and that his behavior was not violent or tumultuous. As to fighting, there is no evidence of Sanders attempting to fight the officers. As to threatening, Sanders did say "If you touch my dog," leaving the sentence unfinished. But he said that to Officers Bauer and Saleh before Officers Otundo and Montero had even arrived. (Azem Video 5 at 0:27–47; IA Rep. at 6.) As to violent or tumultuous behavior, there were no indications that

---

Section III.A.5.a.ii, *infra.* It did not, so even if that conduct should be considered in the false-arrest or false-imprisonment context, it would not change my conclusion.

Sanders would get violent. (*See* Saleh Dep. at 47:11–20, 51:6–53:20.) True, as noted above, a juror might (or might not) credit the statements of Otundo and Montero that, just prior to the altercation, Sanders jabbed his fingers at Otundo's face or went for his gun. (IA Rep. at 5; Otundo Dep. at 79:4–12.) But a juror could alternatively credit Sanders's testimony or view his raised arm as innocuous. (Section III.A.1.a.i, *supra*.) If that is the case, Sanders's conduct would fall short of criminality. *See State v. Stampone*, 775 A.2d 193, 197 (N.J. Super. Ct. App. Div. 2001) (slamming car door insufficient); *State v. Davis*, 2011 WL 2350039, at *2, 4 (N.J. Super. Ct. App. Div. June 3, 2011) (per curiam) (flailing at officer insufficient).

All said then, issues of fact preclude my holding that Officers Otundo and Montero had probable cause to arrest based on the three offenses charged.

### b. Other Offenses Suggested by the Charging Documents

The criminal complaint equivocally refers to two other charges. First, one version of the complaint included a fourth charge for obstruction of lawful government function, N.J. Stat. Ann. § 2C:29-1(a). (Crim. Compl. at 2.) This charge, however, is not on the copy seemingly signed by the magistrate, and is not included in the municipal court's list of dismissed charges. (*Id.* at 3; Muni. Ct. Doc. at 1.) Second, the criminal complaint, in the charge of disorderly conduct, stated that Mr. Sanders used "offensive language towards the public." (Crim. Compl. at 3.) The disorderly-conduct statute contains a subsection proscribing such language, but that subsection was not cited as the basis for the charge, and that charge is not cited in the dismissal. (*Id.*; Muni. Ct. Doc. at 1.)

Still, I can assess whether officers had probable cause to arrest even for offenses not formally charged. *See Devenpeck v. Alford*, 543 U.S. 146, 153–55 (2004) (officers' suspicions that suspect was impersonating a police officer supported arrest, even if the suspect was only later charged with an unrelated crime that was dismissed); *Wright v. City of Philadelphia*, 409 F.3d 595, 602 (3d Cir. 2005) ("[I]t is irrelevant to the probable cause analysis what crime a

suspect is eventually charged with . . . ."); *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994) ("Probable cause need only exist as to any offense that could be charged under the circumstances."). So I consider the two offenses.

The officers lacked probable cause for obstruction of a lawful government function. "[L]awfully performing an official function" refers to "a police officer acting in objective good faith, under color of law in the execution of his duties." *State v. Reece*, 117 A.3d 1235, 1245 (N.J. 2015) (citation omitted). I assume, then, that the officers' efforts to get Mr. Sanders to comply with the leash ordinance qualify. But obstruction "requires affirmative interference," meaning that the defendant made some "physical effort" to interfere with law enforcement prior to the onset of arrest. *State v. Fede*, 202 A.3d 1281, 1287 (N.J. 2019). The "mere refusal to follow a police officer's order" is not enough. *State v. Camillo*, 887 A.2d 1151, 1155 (N.J. Super. Ct. App. Div. 2005); *see also Fede*, 202 A.3d at 1287 (defendant's refusal to unlock door when officers attempted to enter house did not qualify). Mr. Sanders's failure to leash his dog would not support probable cause for the additional offense of obstruction. His only physical act towards the two arresting officers prior to the (attempted) arrest was his raised arm, but I have explained why a juror could find that inoffensive. Thus, there is at best an issue of fact as to whether the obstruction offense provided probable cause to arrest.

Neither could the offensive-language statue provide probable cause, because the statute is unconstitutional and unenforceable. The statute makes it an offense for someone to use "unreasonably loud and offensively coarse or abusive language," if it is uttered "in a public place, and with purpose to offend the sensibilities of a hearer or in reckless disregard of the probability of so doing." N.J. Stat. Ann. § 2C:33-2(b). For Mr. Sanders's obnoxious behavior and profanity directed at officers of the law, there is no excuse. But the New Jersey Superior Court, Appellate Division, barred enforcement of the "abusive language" statute because it violates the First Amendment. *State in Interest of*

*H.D.*, 501 A.2d 1016, 1018 (N.J. Super. Ct. App. Div. 1985); *see also, e.g.*, *State v. Soo Hwan Kim*, No. A-5958-11T2, 2014 WL 861582, at *1 (N.J. Super. Ct. App. Div. Mar. 6, 2014) (per curiam) (reversing conviction under § 2C:33-2(b) because the statute is unconstitutional). That being the case, the Third Circuit has held that officers are not authorized to arrest for violations of § 2C:33-2(b). *Halpin v. City of Camden*, 310 F. App'x 532, 534 (3d Cir. 2009). Thus, the offensive-language statute could not provide probable cause.

### c. Leash Ordinance

Finally, I must address whether Mr. Sanders's violation of Jersey City's leash ordinance, although not mentioned in the criminal complaint, furnished probable cause. (*See* Otundo Br. at 7, 15; Defs. Br. at 18.)[9] I am compelled to conclude that this infraction, though minor, did provide probable cause. I therefore go on to discuss how the ordinance impacts Mr. Sanders's claims under (i) the Fourth Amendment and (ii) the New Jersey Constitution.

### i. Fourth Amendment

The Supreme Court has held that "even a very minor criminal offense" may provide probable cause to arrest. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). That state law does not authorize arrest for a particular

---

[9] Defendants barely preserved an argument that the leash ordinance provided probable cause. Their briefs' references to the ordinance are passing. (*See* Otundo Br. at 7, 15; Defs. Br. at 18.) "Typically, arguments raised in passing but not squarely argued, are considered waived." *Yates Real Estate, Inc. v. Plainfield Zoning Bd. of Adjustment*, 404 F. Supp. 3d 889, 913 n.28 (D.N.J. 2019) (cleaned up).

Nonetheless, I will consider the ordinance because Defendants have invoked a probable-cause defense, "[p]robable cause need only exist as to any offense," *Barna*, 42 F.3d at 819, the briefs at least mention the ordinance, and the record is clear that at some point the officers planned to issue Mr. Sanders a summons for the leash-law violation (Otundo Dep. at 75:24–76:1). It would not make sense to turn a blind eye to the leash ordinance when it is all over the record. *See Mesa v. Prejean*, 543 F.3d 264, 272 n.2 (5th Cir. 2008) (considering offenses argued in the briefs and supported by the record); *cf. Tearpock-Martini v. Borough of Shickshinny*, 756 F.3d 232, 238 (3d Cir. 2014) ("When an issue is properly before us, we are not limited to the particular legal theories advanced by the parties, but rather retain the independent power to identify and apply the proper construction of governing law." (cleaned up)).

offense does not mean that such an arrest would violate the Fourth
Amendment. *Virginia v. Moore*, 553 U.S. 164, 176 (2008).

The leash ordinance provides that "no person who owns . . . any dog
shall suffer or permit it to be upon the public streets or in any of the public
places of the city unless such dog is accompanied by a responsible person and
is securely confined and controlled by one adequate leash." Jersey City
Ordinance § 90-16.[10] The ordinance carries a maximum penalty of a $2,000
fine, 90 days' imprisonment, and/or 90 days' community service. *Id.* § 1-25(A);
*see id.* § 90-22(B) (providing for the penalties in § 1-25).[11] The officers received
calls about Magoo roaming the street, and, for the duration of their encounter
with Mr. Sanders, he declined to leash the dog. Accordingly, no reasonable
juror could find that the officers lacked probable cause for a violation of the
leash ordinance.

To be sure, *Atwater* left open the possibility that officers could effect an
arrest for a minor offense in such an "extraordinary manner" that they would
violate the Fourth Amendment. *See* 532 U.S. at 355 (citation omitted).
Nonetheless, the *Atwater* Court held that the plaintiff, who violated a seatbelt

---

[10]     *Available at*
https://library.municode.com/nj/jersey_city/codes/code_of_ordinances. "Municipal
ordinances that are available online . . . constitute public records and are subject to
judicial notice." *Hena v. Vandegrift*, --- F. Supp. 3d ----, ----, No. 18-762, 2020 WL
1158640, at *25 (W.D. Pa. Mar. 10, 2020) (collecting cases).

[11]     There is a reasonable argument that, despite *Atwater*'s and *Moore*'s holdings,
the offense, however minor, must still be criminal, *i.e.*, at least a misdemeanor as in
*Atwater* and *Moore*. *See Lee v. Ferraro*, 284 F.3d 1188, 1196 (11th Cir. 2002) (noting
argument but concluding that the offense was nonetheless criminal). *But see Noviho v.
Lancaster County*, 683 F. App'x 160, 162, 165 (3d Cir. 2017) ("summary offenses" in
Pennsylvania, which are graded below a misdemeanor and only impose a small fine,
can support an arrest); *Primrose v. Mellott*, 541 F. App'x 177, 181 (3d Cir. 2013)
(same). New Jersey, however, does not use the misdemeanor classification. *Holloway
v. Att'y Gen. U.S.*, 948 F.3d 164, 175 (3d Cir. 2020) (citation omitted), *cert. denied*, ---
S. Ct. ----, 2021 WL 1520792 (U.S. Apr. 19, 2021). At least in other contexts, the Third
Circuit instructs that the maximum penalty available is more pertinent when
determining the seriousness of an offense. *Id.* The maximum penalty for the leash
ordinance exceeds the penalty in *Atwater* ($25–50 fine), so *Atwater* must apply.

law and was handcuffed and detained at the police station for an hour, did not face an extraordinary arrest. *Id.* Mr. Sanders faced similar circumstances with two exceptions: Officer Otundo used arguably excessive force, and Sanders was detained for 24 hours, as evidenced by his handcuffing to a hospital bed. These distinguishing circumstances, however, do not render the arrest "extraordinary" within the meaning of *Atwater.*

First, courts have required that all such claims, to the extent they are based on the force applied, be analyzed as excessive-force claims. *Lee v. Ferraro*, 284 F.3d 1188, 1197–98 (11th Cir. 2002); *see Ference v. Township of Hamilton*, 538 F. Supp. 2d 785, 803 (D.N.J. 2008). This follows from the Supreme Court's instruction that "*all* claims that law enforcement officers have used excessive force . . . should be analyzed under the . . . 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original). Thus, although the character of this arrest was surely disproportionate to the offense, that disproportion does not render the *arrest itself* unconstitutional.

Next, although Mr. Sanders's length of detention exceeded that in *Atwater*, it was not unreasonable. *Atwater* held that a minor offense allows an officer to make a custodial arrest. 532 U.S. at 354. A custodial arrest, in turn, generally allows a detention for up to 48 hours before a magistrate must review whether probable cause exists to merit continued detention. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991); *see also Atwater*, 532 U.S. at 352 (citing *McLaughlin* as a protection afforded to minor-offense detainees). Sanders was detained for half that time. In any event, he has not argued that his detention was unreasonably lengthy. *McLaughlin*, 500 U.S. at 56–57.

Thus, under *Atwater* and *Moore*, Mr. Sanders's violation of the leash ordinance provided Officers Otundo and Montero probable cause to arrest and detain him, at least under the Fourth Amendment.[12]

---

[12]    It is not lost on me that only this very minor leash law violation stands between these officers and a clearly established false-arrest violation. New Jersey law was clear that Mr. Sanders had not otherwise committed an offense. Swearing at a police officer, though disrespectful, cannot support an arrest. *Halpin*, 310 F. App'x at 534. New

### ii.   New Jersey Constitution

The analysis is different to the extent Mr. Sanders brings his false-arrest and false-imprisonment claims under the NJCRA. (*See* Compl., Count 5.) While state-law designations of arrestable offenses are irrelevant for Fourth Amendment claims, such designations are, of course, relevant to state constitutional claims. Thus, I must decide if, under New Jersey law, the officers could arrest Mr. Sanders.

By statute, officers may "upon view arrest any disorderly person or any person committing a breach of the peace." N.J. Stat. Ann. § 40A:14-152. New Jersey courts have implied that this statute is coterminous with an officer's constitutional power to arrest. *See State v. Brown*, 14 A.3d 26, 34 (N.J. 2011) (arrest was valid under Article I, paragraph 7, in part because officers had authority to arrest under § 40A:14-152); *see also, e.g., State ex rel. R.M.*, 974 A.2d 1110, 1113–14 (N.J. Super. Ct. App. Div. 2009).[13] "There are two preconditions to exercise of the power of arrest under this section: (1) the offense must have occurred 'upon view' of the officer, and (2) the offender must be either a 'disorderly person' or have committed a 'breach of the peace.'" *State v. Hurtado*, 529 A.2d 1000, 1007 (N.J. Super. Ct. App. Div. 1987) (Skillman, J., dissenting), *rev'd on dissent*, 549 A.2d 428 (N.J. 1988) (per curiam) ("The judgment of the Appellate Division is reversed . . . substantially for the reasons

---

Jersey has long decriminalized public intoxication as such. *See* N.J. Stat. Ann. §§ 26:2B-29, 26:2B-16. Mere failure to comply with an officer's demands is not a crime. *Camillo*, 887 A.2d at 1155. Disorderly conduct is not established simply by a person's cursing, yelling, or ineffectually flailing at an officer. *Stampone*, 775 A.2d at 197–98; *Davis*, 2011 WL 2350039, at *2, 4.

All said then, even cursory knowledge of the offenses would indicate that a non-threatening, albeit intoxicated, cursing, and uncooperative, person had committed no crime. Where the lack of criminality is so clear, qualified immunity will not defeat liability. *See Peroza-Benitez*, 2021 WL 1307883, at *5 ("A public official does not get the benefit of one liability-free violation simply because the circumstance of his case is not identical to that of a prior case." (quotation marks and citation omitted)).

[13]   Regardless, the NJCRA allows a plaintiff to sue for deprivations of statutory rights. *Harz v. Borough of Spring Lake*, 191 A.3d 547, 555–56 (N.J. 2018).

expressed in the dissenting opinion of Judge Skillman."); *see also, e.g.*, *Marion v. Borough of Manasquan*, 555 A.2d 699, 704 (N.J. Super. Ct. App. Div. 1989) (applying the *Hurtado* dissent as the governing standard). The officers here witnessed Mr. Sanders's defiant refusal to obey the leash ordinance. The harder question is whether that refusal converted Sanders's leash-law violation to a "disorderly persons" offense or a "breach of the peace."

"Violation of a municipal ordinance is not a disorderly persons offense. Consequently, the police officers' power to detain plaintiffs . . . depends solely upon whether the violation of the ordinance can be considered a 'breach of the peace.'" *Marion*, 555 A.2d at 704.[14] A "breach of the peace" is not defined, but the traditional definition includes "engaging in an affray" and "being intoxicated and yelling on a public street." *Hurtado*, 529 A.2d at 1007 (citation omitted). *Hurtado* also suggested that "deliberate defiance of the officer" could be a breach of the peace, but "a simple act of insolence towards authority" does not suffice. *Id.* In so suggesting, *Hurtado* implied that the analysis does not focus just on whether the ordinance itself involves a breach of the peace but encompasses whether the arrestee violated the ordinance in a manner that, in addition, beached the peace. *See id.* ("Defendant's *actions* in throwing litter on the street [in violation of a littering ordinance] . . . cannot reasonably be found to have constituted a 'breach of the peace.'" (emphasis added)); *accord State v.*

---

[14]     There is contrary authority. In *State v. Vonderfecht*, the Appellate Division held that the arresting power is not confined to disorderly persons *offenses* but extends to disorderly persons generally. 665 A.2d 1145, 1147 (N.J. Super. Ct. App. Div. 1995). As such, courts review the "conduct of the offender." *Id.* Based on that reasoning, the court held that a person who committed a petty disorderly person offense, a grade lower than disorderly person offenses, was a "disorderly person" under § 40A:14-152. *Id.* The New Jersey Supreme Court adopted *Vonderfecht*'s holding that officers can arrest for petty disorderly persons offenses. *State v. Dangerfield*, 795 A.2d 250, 260 (N.J. 2002). What is more, a court in this District, applying those precedents, held that a person who violated a municipal ordinance was a disorderly person under § 40A:14-152. *Ference*, 538 F. Supp. 2d at 802–03.

     I, however, need not reconcile *Vonderfecht*, *Dangerfield*, and *Hurtado* and decide whether Mr. Sanders could also qualify as a disorderly person because I conclude that he could be arrested for breaching the peace.

*Vonderfecht*, 665 A.2d 1145, 1147 (N.J. Super. Ct. App. Div. 1995) ("[T]he only focus is upon the conduct of the offenders . . . .").

Officers Otundo and Montero had probable cause to believe that Mr. Sanders breached the peace. His repeated refusals to obey the leash ordinance crossed from "a simple act of insolence towards authority" to a "deliberate defiance of the officer." *Hurtado*, 529 A.2d at 1007. Further, his refusals were in the context of an extended, loud, confrontation with the officers. *Id.* He was "intoxicated and yelling on a public street" before and during this encounter. *Id.* This is not to say that an officer can arrest someone solely for being loud, drunk, and noncooperative (at least in New Jersey). *See* n.12, *supra.* Rather, as I read *Hurtado*, there must be an underlying violation of an ordinance accompanied by peace-breaching behavior. Thus, because Sanders violated the leash ordinance and did so in a way that breached the peace, the officers could reasonably believe that an arrest was supported by New Jersey law. Accordingly, Sanders cannot succeed on his NJCRA claim based on false arrest or imprisonment.

For these reasons, Officers Otundo's and Montero's motions for summary judgment on Count 1 and Count 5, to the extent based on false arrest and imprisonment, will be granted.

### 4. Illegal Search and Seizure

Mr. Sanders pleads a claim for "illegal search and seizure." (Compl., Count 2.) His briefs indicate that this claim is essentially a recasting of his false-arrest and false-imprisonment claim. (Opp. to Otundo Br. at 16–17.) Indeed, these are all just different ways of seeking recovery for a Fourth-Amendment seizure. *See Dorval v. State*, Civ. No. 20-5997, 2021 WL 236625, at *3 n.4 (D.N.J. Jan. 25, 2021). Thus, the claim should be defeated by a showing of probable cause. *See Cresci v. Kazan*, Civ. No. 19-19928, 2020 WL 5700754, at *3 (D.N.J. Sept. 24, 2020).

Even if Mr. Sanders were claiming that Officers Otundo and Montero unlawfully searched him, that claim would fail. To be sure, the record shows

that Otundo and Montero took Sanders to "[p]rocessing" (Otundo Dep. at 124:5–25:2), and a juror could infer that such processing included searches of Sanders's person, as is customary. *See Illinois v. Lafayette*, 462 U.S. 640, 643–44 (1983). In addition, the officers returned to the hospital the next day to fingerprint him. (Sanders Dep. at 81:7–13.) Nonetheless, arrests for even minor offenses permit booking searches and fingerprinting. *See Moore*, 553 U.S. at 176–77 (arrests for minor offenses allow for searches incident to arrest including at booking); *Maryland v. King*, 569 U.S. 435, 461 (2013) (searches incident to arrest can include fingerprinting); *State v. Daniels*, 924 A.2d 582, 591 (N.J. Super. Ct. App. Div. 2007) (searches incident to arrest for minor offenses permissible under Article I, paragraph 7). Because the initial arrest was lawful, so were routine subsequent searches. *Moore*, 553 U.S. at 176–77.

For these reasons, Officers Otundo's and Montero's motions for summary judgment on Count 2 and Count 5, to the extent based on an unconstitutional search, will be granted.

### 5. Malicious Prosecution

After Mr. Sanders was taken to the hospital, Officers Otundo and Montero prepared a criminal complaint. Mr. Sanders alleges that they are thus liable for malicious prosecution. (*See* Compl., Counts 5, 9.)

#### a. Constitutional Violation

Constitutional protections against unreasonable seizures also mean that officials cannot initiate criminal processes without probable cause. *See Johnson v. Knorr*, 477 F.3d 75, 82–83 (3d Cir. 2007) (Fourth Amendment); *Middleton v. City of Ocean City*, Civ. No. 12-0605, 2014 WL 2931046, at *5 n.4 (D.N.J. June 30, 2014) (Article I, paragraph 7).[15] A malicious-prosecution claim has five elements:

---

[15]    There is also a common-law tort for malicious prosecution. *LoBiondo v. Schwartz*, 970 A.2d 1007, 1022 (N.J. 2009). But Mr. Sanders's briefs treat his malicious-prosecution claim as constitutional, so I follow suit. I also assume, given that Count 5 alleges that all alleged federal constitutional violations are also state constitutional violations, that he also brings that claim under the NJCRA.

(1) the defendants initiated a criminal proceeding;

(2) the criminal proceeding ended in the plaintiff's favor;

(3) the proceeding was initiated without probable cause;

(4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and

(5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

*Harvard*, 973 F.3d at 203 (cleaned up). Defendants only move for summary judgment based on Mr. Sanders's ability to prove the first, third, and fourth elements. (Defs. Br. at 7, 13; Otundo Br. at 24.)[16]

### i.   Initiation of Criminal Proceedings

Officer Otundo argues that he never initiated a criminal proceeding against Mr. Sanders because Officer Montero signed the criminal complaint. (Otundo Br. at 24.) "In most cases, a prosecutor rather than a police officer initiates a criminal prosecution," so the prosecutor is the proper defendant. *Fought v. City of Wilkes-Barre*, 466 F. Supp. 3d 477, 507 n.6 (M.D. Pa. 2020) (cleaned up). Particularly as to minor offenses, however, charging complaints may be drafted by officers in this state. The record does not provide any details of Mr. Sanders's proceedings beyond the criminal complaint and dismissal. Regardless, "[i]f the officers influenced or participated in the decision to institute criminal proceedings, they can be liable for malicious prosecution." *Halsey v. Pfeiffer*, 750 F.3d 273, 297 (3d Cir. 2014). As a result, an officer can be liable for what the officer includes in (or omits from) an affidavit for probable

---

[16]      Regardless, the second element is satisfied "if the criminal case was disposed of in a way that indicates the innocence of the accused," such as "a discharge by a magistrate at a preliminary hearing." *Allen v. N.J. State Police*, 974 F.3d 497, 502–03 (3d Cir. 2020) (quotation marks and citation omitted). So the dismissal by the municipal court would suggest a favorable termination. As to the fifth element, Mr. Sanders was handcuffed while in the hospital for nearly 24 hours following the arrest, during and after when the officers filed the criminal complaint. He also had to make court appearances. Thus, he suffered a seizure in connection with the charges. *See Gallo v. City of Philadelphia*, 161 F.3d 217, 223 (3d Cir. 1998) (arrest and mandatory appearance in court to answer for charges amounted to seizure for a malicious-prosecution claim).

cause and the manner in which the officer drafts a criminal complaint. *See Harvard*, 973 F.3d at 203.

Given that, the first element of malicious prosecution is satisfied as to Officer Otundo. He worked with Officer Montero to draft the criminal complaint, and they discussed and decided together what offenses to charge. (Otundo Dep. at 72:1–73:17.) Moreover, the affidavit of probable cause was written by Otundo. (Crim. Compl. at 4.) Thus, Otundo cannot defeat summary judgment based on the first element.

### ii.   Probable Cause

Both officers move for summary judgment on the ground that there was probable cause. For the malicious-prosecution claim, the probable cause analysis differs from the false-arrest context. Whereas false-arrest claims require me to assess probable cause up to the moment of arrest, malicious-prosecution claims require me to assess whether the officers had probable cause as to each offense *charged*. *See Johnson*, 477 F.3d at 85 (malicious-prosecution liability lies if probable cause was lacking for any offense charged).

That principle has two consequences here. First, the officers' probable cause to arrest Mr. Sanders for violating the leash ordinance does not insulate them from the malicious-prosecution claim. *See id.* Second, I must consider whether Mr. Sanders's conduct during the altercation (*i.e.*, even after the arrest was initiated) supported the charges eventually brought. *See Harvard*, at 201 n.4, 202–03 (explaining that, in a case where a person was arrested for driving under the influence, the Court would not consider a drug evaluation performed at the police station when assessing probable cause for the arrest but could consider it for the malicious-prosecution claim).

With those differences in mind, I find that a juror could conclude that probable cause was lacking as to all charges. For starters, I have already concluded that a juror could find that probable cause was lacking for the offenses charged (or even passively referenced in the complaint) based on events occurring up until the arrest. (Section III.A.3.a–b, *supra*.) I now further conclude that there are factual disputes as to Mr. Sanders's conduct during

and after the arrest that are material to the issue of whether the officers had probable cause to charge him. *See Halsey*, 750 F.3d at 300 (factual disputes as to probable cause preclude summary judgment on a malicious-prosecution claim).

Recall that, viewing the record most favorably to Mr. Sanders, a juror could view the video and perceive little to no physical force or resistance coming from Sanders. Indeed, the video shows no punches or choking from him. Rather, Officer Otundo was on top of Sanders nearly the entire time. Still further, Officer Montero never felt the need to get involved, which suggests that Sanders was not resisting. (Again, the officers have testified otherwise, but I cannot resolve that factual dispute on summary judgment.)

First, on the assault charge, the minimal or non-existent physical force coming from Mr. Sanders in the video means that he did not "[a]ttempt to cause or purposely, knowingly or recklessly cause[] bodily injury to another." N.J. Stat. Ann. § 2C:12-1(a)(1); *see Groman*, 47 F.3d at 635 ("[S]hould a jury decide that Groman did not hit Kirkland, it could determine that Kirkland lacked probable cause to arrest him on the aggravated assault charge.").

Second, on the resisting-arrest charge, Mr. Sanders must have "purposely prevent[ed] or attempt[ed] to prevent a law enforcement officer from effecting an arrest." N.J. Stat. Ann. § 2C:29-2(a)(1). Mr. Sanders denies that he was even told he was under arrest. (Sanders Dep. at 70:1–23.) From his point of view, he says, he was simply being assaulted. In addition, a juror could view the video and perceive that, although Sanders did not immediately submit to arrest, any physical response from him while on the ground was a result of shock from the sudden shove or self-defense in response to excessive force. *See State v. Simms*, 849 A.2d 573, 577 (N.J. Super. Ct. App. Div. 2004) ("[I]f the officer uses excessive or unnecessary force the citizen may respond or counter with the use of reasonable force to protect himself . . . ." (quotation marks and citation omitted)). For those two reasons, a juror could find that he did not *purposefully* prevent an arrest.

36

Third, a juror could find that the disorderly-conduct charge is deficient in two ways. To start, the person must "[e]ngage[] in fighting or threatening, or in violent or tumultuous behavior." N.J. Stat. Ann. § 2C:33-2(a)(1). Mr. Sanders's limited physicality during the altercation, as seen in the video, falls short of such conduct. Even if he had engaged in such conduct, he must have done so with a "purpose to cause public inconvenience, annoyance[,] or alarm" or "recklessly creat[ed] a risk thereof." *Id.* Taking an adversarial position to the police officers, even a physical one, does not evince a public-facing purpose. As the Appellate Division explained, a "testy exchange" with a police officer does not qualify for the disorderly-conduct offense because the defendant's actions are directed at the officer—not the public. *Stampone*, 775 A.2d at 197. Accordingly, a juror could find that there was not probable cause for the disorderly-conduct charge.

In sum, a juror could find probable cause lacking on each crime charged.

### iii.   Malice

Officer Montero argues that Mr. Sanders cannot show malice. (Defs. Br. at 6–7.) But "malice may be inferred from want of probable cause." *Dorval*, 2021 WL 236625, at *8 (quoting *Brunson v. Affinity Fed. Credit Union*, 972 A.2d 1112, 1120 (N.J. 2009)). As a result, fact issues precluding a finding on probable cause will generally also preclude a finding on malice. *Bartlebaugh v. City of Camden*, Civ. No. 05-0121, 2007 WL 4415066, at *2 (D.N.J. Dec. 13, 2007).

And there is extrinsic evidence of malice. Mischaracterizing events in an affidavit can show malice. *Harvard*, 973 F.3d at 203–04. Here, the affidavit describes Mr. Sanders choking Officer Otundo, but Sanders flatly denies that characterization, and the video does not show any choking. (Crim. Compl. at 4; Sanders Dep. at 74:4–8.) Further, the affidavit describes a tense situation in which the officers not only were dealing with Mr. Sanders but also "in a physical struggle" with Magoo who "was getting agitated and began to take biting attempts." (Crim. Compl. at 4.) But a juror could watch the video and see Magoo playfully hopping around the officers. Moreover, Otundo was never in a

"physical struggle" with Magoo; he was occupied with Sanders. Thus, a juror could conclude that the officers mischaracterized the events in a way that supported Otundo's use of force. Such self-serving mischaracterization—if accepted by a finder of fact—would permit a finding of malice. *Harvard*, 973 F.3d at 203–04.

In addition, Mr. Sanders testified that Officer Otundo cursed at him and used a homophobic slur while punching him. (Sanders Dep. at 67:17–22.) A juror who credited that testimony could conclude that the officers' decision to pursue charges was motivated in part by animosity toward Sanders, "a purpose other than bringing [him] to justice." *Harvard*, 973 F.3d at 203. This, too, creates a factual issue precluding a finding on malice.

To recap, Officers Otundo's and Montero's arguments for summary judgment on the malicious-prosecution claim fail because there are factual issues. As such, I cannot rule on summary judgment that there was no constitutional violation.

### b. Clearly Established

The Third Circuit has held that the right to be free from prosecution absent probable cause is clearly established. *Andrews*, 853 F.3d at 705; *Gallo v. City of Philadelphia*, 161 F.3d 217, 220 n.4 (3d Cir. 1998). For the reasons given at note 12, *supra*, and supplemented in this section, the lack of probable cause, based on Mr. Sanders's version of the facts, would have been clear to any reasonable officer. Thus, Officers Otundo and Montero violated a clearly established right.

For these reasons, Officers Otundo's and Montero's motions for summary judgment on Count 9 and Count 5, to the extent based on malicious prosecution, will be denied.

### 6. Conspiracy

Mr. Sanders alleges that Officer Otundo and Montero's joint work on the criminal charges amounts to a § 1983 conspiracy. (Compl., Count 7.) To prevail on that claim, he "must prove that persons acting under color of state law

reached an understanding to deprive him of his constitutional rights. This requires that the state actors took concerted action based on an agreement to deprive the plaintiff of his constitutional rights, and that there was an actual underlying constitutional violation . . . ." *Harvard*, 973 F.3d at 207 (quotation marks and citation omitted). To defeat summary judgment, a plaintiff need only point to circumstantial evidence of an agreement and concerted action. *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 295 (3d Cir. 2018). This includes conversations between the officers, distorted stories in police reports, and time available to reach an agreement. *Id.* at 295–97.

Mr. Sanders produced such evidence here. Officers Otundo and Montero drove back from the hospital to the police station together and then jointly worked on the criminal charges. They had conversations about what offenses to charge. (Otundo Dep. at 72:1–73:17, 195:7–196:14.) The affidavit of probable cause was written by Otundo, while Montero signed the criminal complaint, making the charging instrument a partner project. (Crim. Compl. at 3, 4.) There is thus circumstantial evidence of an agreement and concerted action. Moreover, a juror could find that the object of their efforts was to deprive Mr. Sanders of his right to be free from prosecution absent probable cause, because the charges were lacking in probable cause and the facts alleged in the criminal complaint were (on one permissible view of the facts) distorted. (*See* Section III.A.5.a.ii–iii, *supra*.)

Finally, taking the facts in Mr. Sanders's favor, the officers violated Mr. Sanders's clearly established rights by bringing the charges. (Section III.A.5.b, *supra*.) Doing so in concert does not change the qualified immunity analysis. *See Cope v. Encapera*, 758 F. App'x 252, 257 (3d Cir. 2018) (facts showing that clearly established rights were violated precluded summary judgment on accompanying conspiracy claim). Regardless, it was clearly established that officers cannot conspire to maliciously prosecute individuals. *E.g.*, *Molina v. City of Lancaster*, 159 F. Supp. 2d. 813, 820 (E.D. Pa. 2001); *Cipolla v. County of Rensselaer*, 129 F. Supp. 2d 436, 456 (N.D.N.Y. 2001).

For these reasons, Officers Otundo's and Montero's motions for summary judgment on Count 7 will be denied.

### B. Individual State Tort Claims

I now turn to the claims that arise purely under state law: (1) assault and battery, and (2) IIED and NIED.

#### 1. Assault and Battery

Mr. Sanders alleges that Officers Otundo and Montero are liable for assault and battery based on the altercation and his arrest. (*See* Compl., Count 10.) "A person is subject to liability for the common law tort of assault if: (a) he acts intending to cause a harmful or offensive contact with the person of the other . . . , or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension." *Leang v. Jersey City Bd. of Educ.*, 969 A.2d 1097, 1117 (N.J. 2009) (quotation marks and citation omitted). "The tort of battery rests upon a nonconsensual touching," *id.*, "even if harmless," *Russo Farms, Inc. v. Vineland Bd. of Educ.*, 675 A.2d 1077, 1087 (N.J. 1996) (citation omitted). Although arrests may involve force that would qualify as an assault or battery, an officer is only liable if the force was excessive. *Panarello v. City of Vineland*, 160 F. Supp. 3d 734, 767 (D.N.J. 2016) (citing *State v. Williams*, 148 A.2d 22, 28–29 (N.J. 1959)); *see also, e.g.*, *Hill v. Algor*, 85 F. Supp. 2d 391, 411 (D.N.J. 2000). So the analysis for assault and battery tracks the analysis for excessive force. *Id.* There are genuine disputes of fact as to whether the officers used excessive force (Section III.A.1.a, *supra*), so I cannot grant summary judgment on the assault and battery claims. *Mantz v. Chain*, 239 F. Supp. 2d 486, 507 (D.N.J. 2002).

For these reasons, Officers Otundo's and Montero's motions for summary on Count 10 will be denied.

#### 2. IIED and NIED

Mr. Sanders alleges claims for IIED and NIED. (Compl., Count 8.) Officers Otundo and Montero argue that they have immunity under the New

Jersey Tort Claims Act ("NJTCA"), N.J. Stat. Ann. § 59:9-2(d), and Mr. Sanders lacks evidence on the elements. (Otundo Br. at 23; Defs. Br. at 41–45.)

### a. NJTCA

Officer Montero invokes the NJTCA, which provides that "[n]o damages shall be awarded against a . . . public employee for pain and suffering resulting from any injury; provided, however, that this limitation . . . shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00." N.J. Stat. Ann. § 59:9-2(d). He argues that this provision, called the "verbal threshold," bars emotional-distress damages and thus Mr. Sanders's IIED and NIED claims. (Defs. Br. at 41–42.)[17] Reliance on the verbal threshold is misplaced for two reasons.

First, the verbal threshold does not grant immunity from IIED claims. *Leang*, 969 A.2d at 1115. This is so because the NJTCA elsewhere "strip[s] away immunity for acts of willful misconduct." *Id.* at 1113 (citing N.J. Stat. Ann. § 59:3-14(a)). "Willful misconduct" is more than "simple negligence" but less than "intentional infliction of harm." *Alston v. City of Camden*, 773 A.2d 693, 185 (N.J. 2001). As a result, "the elements of the [IIED] cause of action place the claim outside of the scope of the qualified immunity and the verbal threshold protection otherwise available to defendants." *Leang*, 969 A.2d at 1115. If Mr. Sanders can create a genuine dispute of material fact on those elements, then the verbal threshold does not apply.

Second, as to both claims, the verbal threshold does not apply to "permanent psychological injury, when properly documented." *Nieves v. Office of the Pub. Defender*, 230 A.3d 227, 237 (N.J. 2020). For example, the verbal

---

[17]    Officer Montero only claims immunity under the NJTCA for this reason, and Officer Otundo does not claim immunity at all. The defendant has the burden to prove immunity under the NJTCA. *Faragella v. Jersey City*, Civ. No. 17-3604, 2020 WL 5812798, at *15 (D.N.J. Sept. 30, 2020) (citing *Leang*, 969 A.2d at 1112). Thus, I do not consider any other potential bases for immunity provided by the NJTCA, such as whether the NJTCA generally provides immunity for an NIED claim.

threshold does not bar damages for PTSD resulting from a physical invasion of the person. *Collins v. Union Cty. Jail*, 696 A.2d 625, 630, 631 (N.J. 1997). Mr. Sanders has presented medical evidence of body dysmorphic disorder, PTSD, depression, and anxiety as a result of physical injury, disfigurement, and trauma. Thus, the verbal threshold does not apply.

### b. IIED

An IIED plaintiff must show "(1) intentional conduct; (2) the conduct was extreme and outrageous; (3) the conduct proximately caused plaintiff's emotional distress; and (4) the emotional distress was severe." *DeAngelis v. Hill*, 847 A.2d 1261, 1272 (N.J. 2004). Generally, factual issues precluding summary judgment on an excessive-force claim would preclude summary judgment on the first, second, and third elements of IIED. *E.g., Esposito v. Little Egg Harbor Township*, Civ. No. 08-3725, 2012 WL 1495468, at *6 (D.N.J. Apr. 27, 2012); *Day v. Jackson Township*, Civ. No. 10-4011, 2013 WL 394151, at *9 (D.N.J. Jan. 30, 2012); *Iglesia v. City of Glassboro*, Civ. No. 04-3034, 2007 WL 1723478, at *5–6 (D.N.J. June 13, 2007).

On the first element, the "[d]efendant must intend both to do the act and to produce emotional distress" or the defendant must "act[] recklessly in deliberate disregard of a high degree of probability that emotional distress will follow." *Ingraham v. Ortho-McNeil Pharm.*, 25 A.3d 1191, 1195 (N.J. Super. Ct. App. Div. 2011) (quotation marks and citation omitted). As to Officer Otundo, a juror could find that he intentionally punched Mr. Sanders in the face. (Section III.A.1.a.i, *supra*.) As a result, a juror could find that he either intended to produce emotional distress or acted recklessly in that regard because punches to the head are obviously traumatic. As to Officer Montero, a juror could find that he kicked Sanders or knowingly failed to intervene to prevent harm to Sanders. (Section III.A.2.a.ii, *supra*.) Accordingly, he deliberately disregarded a high risk that Sanders would suffer trauma as a result of (in his version) being set upon by not one but two policemen.

On the second element, excessive force and the knowing failure to prevent it can be considered extreme and outrageous conduct. *Marshall v. Keansburg*, Civ. No. 13-0533, 2013 WL 6095475, at *10 (D.N.J. Nov. 30, 2013); *see also, e.g.*, *McDonald v. County of Sonoma*, No. 20-cv-04183, --- F. Supp. 3d ----, ----, No. 2020 WL 7319400, at *11 (N.D. Cal. Dec. 11, 2020) (collecting cases).

On the third element, Mr. Sanders has produced medical documentation that his psychological injuries are direct the result of the disfigurement and trauma caused by the punches. (Torchinsky Rep. at 3; Gardere Rep. at 22–23.)

On the fourth element, severe emotional distress means "a mental condition of a type which may be generally recognized and diagnosed by clinicians." *See Aly v. Garcia*, 754 A.2d 1232, 1237 (N.J. Super. Ct. App. Div. 2000); *see also Clark v. Nenna*, 244 A.3d 291, 295 (N.J. Super. Ct. App. Div. 2020). Mr. Sanders has produced evidence of such clinical diagnoses. (Gardere Rep. at 22–23.)

Thus, summary judgment is inappropriate on the IIED claim.

### c. NIED

An NIED claim requires that "(1) a duty of reasonable care was owed by the defendant to the plaintiff, (2) that duty was breached, (3) the plaintiff suffered severe emotional distress, and (4) the breach was a proximate cause of injury." *G.D. v. Kenny*, 984 A.2d 921, 933 (N.J. Super. Ct. App. Div. 2009) (quotation marks and citation omitted), *aff'd*, 15 A.3d 300 (N.J. 2011). As to the first element, the New Jersey Supreme Court has recognized that police officers owe a duty to arrestees to exercise "reasonable care to preserve the life, health, and safety of the person in custody." *Del Tufo v. Township of Old Bridge*, 685 A.2d 1267, 1272 (N.J. 1996). As to the second element, there are factual disputes as to whether the officers here breached that duty by using excessive force or failing to intervene, so summary judgment is inappropriate. *See Roccisano v. Township of Franklin*, Civ. No. 11-6558, 2013 WL 3654101, at *11 (D.N.J. July 12, 2013) (factual issues on excessive-force claim created factual

issues on breach for negligence claim). The third and fourth elements are essentially the same as for the IIED claim, which are satisfied. *See Innes v. Marzano-Lesnevich*, 87 A.3d 775, 797 (N.J. Super. Ct. App. Div. 2014); *see also Wright-Phillips v. United Airlines, Inc.*, Civ. No. 20-14609, 2021 WL 1221111, at *16 (Apr. 1, 2021). Accordingly, the officers are not entitled to summary judgment on the NIED claim.

For these reasons, Officer Otundo's and Officer Montero's motions for summary on Count 8 will be denied.

### C. Municipal-Liability Claims

Mr. Sanders brings a claim against Jersey City,[18] alleging that its practices failed to prevent Officer Otundo's excessive force. (Compl., Count 4.) A municipality may be liable under § 1983 and the NJCRA if its "policy or custom inflicted the [constitutional] injury in question." *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (cleaned up); *see also Khalil v. City of Paterson*, Civ. No. 18-3241, 2018 WL 6168191, at *9 (D.N.J. Nov. 26, 2018) (same municipal-liability principles apply to NJCRA). Custom "can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Roman*, 914 F.3d at 798 (citation omitted).

A municipality may also be liable if the plaintiff shows that his constitutional injuries "were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (quotation marks and citation omitted). This claim encompasses allegations that a city failed "to train, supervise, and discipline its police officers." *Id.* (citation omitted). A plaintiff must show "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause

---

[18]     The Complaint also alleges this claim against the Police Department, which has been dismissed from the case *See* n.3. The City is the proper defendant.

deprivation of constitutional rights." *Id.* at 106. There is a "close relationship between policy-and-custom claims and failure-or-inadequacy claims." *Id.*

In support of his municipal-liability claim, Mr. Sanders points to evidence that Officer Otundo had faced multiple, similar complaints, so a juror could infer that the City knew about his constitutional violations yet failed to prevent them from reoccurring. He also points to statistical evidence and other investigations to show that the City fails to promptly investigate and resolve excessive-force complaints. (Opp. to Defs. Br. at 31–49.) The City gives essentially two reasons why it is entitled to summary judgment on the municipal-liability claim. However persuasive they may be, they do not establish that there is no factual issue presented.

First, the City argues that its handling of complaints against Officer Otundo is not enough to show a larger custom. Further, the City argues, Otundo never had any charges against him sustained until this matter. (Defs. Br. at 32–34, 37.) Still, multiple complaints against an officer that led to no consequences may allow an inference that a municipality knew or should have known of an officer's propensity to use excessive force but failed to deal with it. *Beck v. City of Pittsburgh*, 89 F.3d 966, 973–74 (3d Cir. 1996). The inference is not inescapable, of course, but it is for the jury to decide whether the City's apparent toleration for an officer's misconduct contributed to Mr. Sanders's treatment here. *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990). Accordingly, such evidence precludes summary judgment. *See Forrest*, 930 F.3d at 108–09. The City proffers a competing explanation of why complaints against Otundo were not sustained and he was permitted to continue on patrol. But the issue is a factual one, involving "the substance of the [Department's] investigatory procedures. Whether those procedures had substance [is] for the jury's consideration." *Beck*, 89 F.3d at 974.

Next, the City argues that statistics of declining resolution rates for excessive-force complaints are not enough because they can be explained by "external factors" and Mr. Sanders has not shown that all those complaints

45

were substantiated. (Defs. Br. at 34–35.) But Mr. Sanders provided a sampling of investigation reports and has pointed to similarities in both the force complained of and how they were minimally investigated. (Opp. to Defs. Br. at 44–47 (citing DE 69-27).) I take no position on whether such statistics, alone, would suffice. But in combination with complaints against the particular officer involved, they may *contribute* to the creation of a triable factual issue. *See City of Canton v. Harris*, 489 U.S. 378, 390–91 (1989) ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city . . . ."); *Merman v. City of Camden*, 824 F. Supp. 2d 581, 591 (D.N.J. 2010). Again, the City appropriately proffers its own interpretations and explanations, but there is enough here to send the issue of a custom or failure to discipline to the jury. *Id.*; *see Beck*, 89 F.3d at 975–76 ("As for drawing inferences from the evidence regarding the adequacy of the investigatory process, . . . it is not beyond the ken of an average juror to assess what a reasonable municipal policymaker would have done with the information in this case." (cleaned up)).

At bottom, an evidentiary package consisting of a history of complaints against the officer responsible for a plaintiff's injury, statistical evidence of resolution of other complaints, sample complaints, and an expert report opining that a police department's practices fell below standards is precisely the sort of evidence the Third Circuit has held is sufficient to withstand summary judgment on a municipal-liability claim. *See Forrest*, 930 F.3d at 108–09; *Thomas v. Cumberland County*, 749 F.3d 217, 225 (3d Cir. 2014).

For these reasons, the City's motion for summary judgment on Count 4 is denied.[19]

---

[19]   The City also argues that a municipality cannot be liable for punitive damages under § 1983 and the NJCRA. (Defs. Br. at 45.) That is correct. *Smith v. Borough of Dunmore*, 633 F.3d 176, 183 (3d Cir. 2011) (§ 1983); N.J. Stat. Ann. § 59:9-2(c) (NJCRA). But Mr. Sanders concedes that he will not seek punitive damages against the City. (Opp. to Defs. Br. at 57.) To the extent the City seeks to strike punitive damages demands against the individual officers, summary judgment is premature. The determination can await the logically prior determination of whether they are liable at all. For § 1983 and NJCRA claims against individuals, "a defendant whose conduct

## IV.   CONCLUSION

For the reasons set forth above, Officer Otundo's motion for summary judgment (DE 65) is granted in part and denied in part. Specifically, it is granted as to the false-arrest, false-imprisonment, and illegal-search claims under § 1983 (Counts 1 and 2), and also the NJCRA claim (Count 5) to the extent it is based on false arrest, false imprisonment, and illegal search. The motion is otherwise denied.

The remaining Defendants' motion for summary judgment (DE 66) is granted in part and denied in part. Specifically, summary judgment is granted to Officer Bauer, Officer Saleh, and the Jersey City Police Department on all claims asserted against them. Summary judgment is granted to Officer Montero as to the false-arrest, false-imprisonment, and illegal-search claims under § 1983 (Counts 1 and 2), and also the NJCRA claim (Count 5) to the extent it is based on false arrest, false imprisonment, and illegal search. The motion is otherwise denied. A separate order will issue.

Dated: April 23, 2021

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**

---

demonstrates a reckless or callous indifference toward others' rights may be liable for punitive damages." *Walker*, 2020 WL 3542502, *4. There are factual disputes here over the nature of Officers Otundo's and Montero's actions and their mindsets, so summary judgment regarding punitive damages is inappropriate. *Artis v. McCann*, Civ. No. 11-3613, 2013 WL 2481251, at *6 (D.N.J. June 10, 2013).